PHILIP G. ANTON v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant.—71 S. W. (2d) 702.

Division Two, May 17, 1934.

*T. E. Francis, B. G. Carpenter* and *Allen, Moser & Marsalek* for appellant.

*Neuhoff & Millar* for respondent.

COOLEY, C.—Suit for damages for personal injuries sustained by plaintiff by falling over a signpost lying on the sidewalk on the west side of DeBaliviere Avenue in St. Louis on the evening of August 21, 1928. Plaintiff recovered judgment for $10,500, from which defendant appealed. Defendant operated a passenger transportation system in which it used street cars and busses. Plaintiff boarded one of the defendant's street cars at a point east of De-Baliviere Avenue for the purpose of going, via said car and one of defendant's busses, to the Municipal Theater in Forest Park. He paid one fare for the entire trip, receiving from the conductor a transfer which entitled him to transfer from car to bus at the crossing of Delmar Boulevard and DeBaliviere Avenue and to complete the journey by bus. He fell and was injured while going from the point where he alighted from the street car to the place where he intended to board the bus. His petition makes nine assignments of negligence on the part of defendant which may be thus summarized: That defendant negligently failed to furnish him, as its passenger, safe means or place to transfer from car to bus and failed to exercise the highest degree of care in that respect; that the sidewalk at the place where he fell was at the time maintained and used by defendant as a "loading place," at which to take passengers on its busses and that it negligently maintained said place with said signpost lying thereon constituting a dangerous obstruction to persons using the same for waiting and boarding its busses; that it negligently permitted said post or pipe to remain on said sidewalk and loading place when it knew or should have known that such obstruction was dangerous to plaintiff and other passengers of defendant transferring from its street cars to its busses and negligently failed to keep said sidewalk at said loading place free of obstructions; that it negligently removed said post from its former standing position and placed it on said walk and loading space, to the peril of persons using the sidewalk and defendant's passengers transferring from said cars to busses; that it negligently failed to warn plaintiff that said walk

and loading space was so obstructed and of the danger of walking over and along the same. Defendant's answer was a general denial. At the close of plaintiff's case defendant offered a demurrer to the evidence which was overruled. Defendant stood upon its demurrer, offering no evidence. In view of defendant's insistence that its demurrer to the evidence should have been sustained a detailed statement of the facts which plaintiff's evidence tended to show is necessary.

Delmar Boulevard runs east and west. DeBaliviere Avenue, in the western part of the city, runs south from Delmar and leads to Forest Park. Defendant transported passengers to the Municipal Theater by its street cars to Delmar and DeBaliviere, thence by bus to the Municipal Theater, charging one fare for the entire trip. Such passengers left the street cars at the above-named intersection, receiving transfer tickets which entitled them to complete the trip by bus. For convenience we shall refer to the square bounded by the north and south lines of Delmar Boulevard and the east and west lines of DeBaliviere Avenue as the intersection. Defendant had a double track street car line in the middle of Delmar Boulevard, the north track being used by westbound cars; also a double track street car line in the middle of DeBaliviere Avenue. On its property at the southwest corner of the intersection it had a brick building referred to as the power house, the east wall of which came to the building line on the west side of DeBaliviere. The length of this building, north and south, is not shown. Immediately south of the power house was an open space the width of which is not shown, and south of that, fronting on DeBaliviere, was its office building in which, plaintiff's petition alleges, as we understand it, defendant also maintained a waiting room. The evidence is silent as to the waiting room. The width on DeBaliviere of the office building is not shown. Just south of the office building car tracks led from those in DeBaliviere Avenue westward into defendant's property. It appears there was at that place an opening extending westward past the office building and connecting with a north and south vehicular passageway so that defendant's busses could and at the time in question did go north in the center of DeBaliviere into Delmar, thence west and around defendant's buildings, coming back into DeBaliviere on the south side of the office building.

At the time of plaintiff's injury the city was reconstructing DeBaliviere Avenue from Delmar south past defendant's property. The old wooden block paving had been removed on each side of the street car tracks, leaving depressions or excavations which were to be filled with concrete and an asphalt surface. The central space occupied by the car tracks, however, which had been paved with granite blocks, had not been disturbed and at that time defendant's busses

were and had been for at least two or three days prior thereto—how much longer plaintiff's witness on that point did not know—driving north on the undisturbed central or car track portion of DeBaliviere to Delmar, thence west and around defendant's buildings to a point on its property south of its office building and adjacent to DeBaliviere, where they stopped to take on and discharge passengers. Except for such use DeBaliviere was closed to vehicular traffic. Wooden trestles or "bucks" or "horses," referred to as a barricade, had been placed across DeBaliviere approximately even with the south building line of Delmar to prevent vehicles entering DeBaliviere.

Plaintiff testified that he had on a number of occasions prior to the evening in question gone to the Municipal Theater by defendant's car and bus line, the last previous trip so made having been four to six weeks prior to August 21, and that on such prior trips defendant's busses had stopped to take on passengers at the sidewalk on the west side of DeBaliviere Avenue at approximately the place where the signpost over which he fell was lying on the evening in question; that at such times a signpost bearing a sign with the words "Bus Stop" printed thereon stood in a cindered park space between curb and sidewalk at about that point, "directly in that neighborhood." His testimony is not precisely definite as to the exact place where the post stood and cars stopped. At one time he said: "They (the cars) were always stopped in front of the office building and just north of that where these two signs were." There was another similar sign farther south near where the car tracks ran westward into defendant's property south of the office building. But plaintiff's testimony as a whole is to the effect that on prior occasions the busses had customarily stopped for passengers at the curb on the west side of DeBaliviere approximately opposite or at least very near the place where the offending signpost lay at the time plaintiff stumbled over it. Plaintiff's witness, Wheeler, a newspaper vendor who had a stand at the southwest corner of the intersection, put said stopping place somewhat farther south. He said one bus would pull up in front of the office building close to the car tracks leading westward into defendant's property and another (he had seen but two there at a time) would stop close behind the first. Plaintiff said he had seen as many as three there at one time. The evidence justifies the inference that the signpost over which plaintiff fell was the one which had previously stood in the cindered space between curb and sidewalk near that point. There is no evidence as to who had erected and maintained it, whether defendant or the city, nor as to who had removed it from its former standing position and placed it on the sidewalk. It was not on defendant's property, the sidewalk and cindered space being within the street lines. The city was doing or having done the work of reconstructing the street. In this work the

street was being widened, the curb being put back farther west and a strip about one foot wide being added to the sidewalk along its east side, eliminating the cindered space. The new curb and the additional strip of sidewalk had been completed. The signpost at the time in question lay lengthwise of the sidewalk and near the curb. It had been lying there since the evening before. Wheeler said it was a few inches from the curb and on the newly-made strip of walk. Plaintiff said it was a few inches inside the east edge of the old part of the walk.

We have stated that the roadway of DeBaliviere Avenue, except the central part where the car tracks were, was torn up for repaving. East of the car tracks the depression was six to nine inches deep. Plaintiff testified in effect that west of the car tracks the concrete work had been completed, leaving a depression of three to five inches in depth to be filled in with the surfacing material and that for a space of eight feet or so next the curb there was to be no such surfacing material and nothing further to be done. However, it clearly appears from the evidence not only that the street was blocked off by the barricade above mentioned, placed there to prevent vehicles from entering it, as plaintiff knew, but that defendant's busses could not practicably have gone in and out except on the undisturbed central portion and could not practicably have received passengers from the sidewalk at or near the place where his evidence tended to show the busses had loaded before the street reconstruction work was undertaken. When he had last boarded the busses at that place the street adjacent thereto had not been torn up. There was not and had never been at that place anything in the nature of a platform except the sidewalk.

On the evening in question, shortly before eight o'clock, plaintiff alighted from the street car on which he had taken passage, at its customary stopping place about at the northeast corner of the intersection. The conductor gave him his transfer ticket but said nothing to him about where he would find the bus he was to take or about any obstruction on the sidewalk on DeBaliviere, said nothing at all to him. There is no evidence that said conductor or any of defendant's employees had actual knowledge of the presence of the signpost on the walk. Plaintiff alighted from the north side of the car. He walked south across Delmar to the southeast corner of the intersection. Then, instead of going directly west in line with the sidewalk on the south side of Delmar across the intersection to the southwest corner thereof, as he could have done, and thence south on the DeBaliviere sidewalk, he took a slightly diagonal course across DeBaliviere south of the barricade and where the street was torn up and under reconstruction, directly to the point on the west sidewalk of DeBaliviere where the post lay, which was thirty or forty feet

south of the southwest corner of the intersection. He stepped up with his left foot onto the curb or walk and, using his own language, "then I stepped over with the right foot, and then in trying to make the next step to go over to where the bus was situated, I tripped over this post that was lying on the ground there." He did not see the obstruction until after he had fallen over it. From his testimony it appears there was at the time a bus waiting on the south side of defendant's office building, the hood of which plaintiff saw projecting beyond, east of, the building as he stepped upon the curb just before he fell.

On direct examination plaintiff said that on the night in question it was dark "at this point;" he could not recall that there were any lights "at this point." On cross-examination he could not remember whether the streets thereabout were lighted or not: "I paid no special attention to the lighting. Q. Well, Delmar and DeBaliviere is a well lighted corner, is it not? A. Well, as I told you, it wasn't a well lighted corner that night for me." It was a very busy corner. He also testified there was a street light maintained by the city on Delmar at the southwest corner of the intersection "about in line with the power house." He saw the excavations in DeBaliviere and the condition of the street; "I saw the street as it was there, naturally." He saw the barricade and understood the street was closed to vehicular traffic.

I. Considering the sidewalk at the point where plaintiff fell as a sidewalk only and not as a place maintained or adopted and used by defendant as a place at which to receive passengers on its busses or discharge them therefrom, there is no actionable negligence shown because of defendant's failure to keep it free of obstruction. It was a public sidewalk, not on defendant's property but in the street, and the duty of keeping it free of dangerous obstructions or defects not caused by defendant rested upon the city, not upon the defendant. [Callaway v. Newman Mercantile Co., 321 Mo. 766, 12 S. W. (2d) 491.] The evidence does not show that defendant owned or had erected the signpost where it had previously stood in the cindered space between sidewalk and curb. The record is barren of evidence tending to show that defendant took said signpost down and placed it on the walk or caused that to be done. It is as likely or more likely that it was done by those reconstructing the street, who were not defendant's employees. Verdicts cannot be based upon conjecture. Also there was no evidence that defendant had actual knowledge or notice that the signpost had been placed or was upon the walk. Absent such knowledge or notice defendant could not be held liable for injuries to plaintiff resulting from the presence of said post on the sidewalk, if placed there by a third person, even if it was defend-

ant's property. [McMahon v. Greenspon Sons Iron & Steel Co. (Mo. App.), 267 S. W. 83.]

■ II. Respondent contends that the place where he fell was one which defendant had adopted and which it used as a place at which to board its busses, thus inviting intending passengers to use same; that he presénted himself at said place for the purpose of boarding the bus with a transfer ticket entitling him to passage thereon, and that, whether he is to be regarded as then a passenger or not, he was at least an "intending passenger," to whom defendant owed the duty of keeping such loading place reasonably safe. He cites on this point Laurent v. U. Rys. Co. (Mo.), 191 S. W. 992; Thomas v. St. L.-S. F. Ry. Co. (Mo. App.), 293 S. W. 1051; Brooks v. Union Depot Bridge & Term. Co., 215 Mo. App. 643, 258 S. W. 724; Watts v. Fleming, 221 Mo. App. 1123, 298 S. W. 107, and cases from other jurisdictions. He also cites cases holding generally that when a person employs for his own purpose a part of a public sidewalk he owes to the public the duty to use due care to keep such place free from dangerous obstructions. Conceding the principle that where a carrier has constructed and maintains a platform or station for the use of intending passengers or has adopted and uses a certain place as a loading place, directly or impliedly inviting intending passengers so to use the same, it owes them the duty to use due care to keep such place free from dangerous obstructions or defects and is liable for negligent failure so to do, we think the rule does not apply to the facts in this case. The place in question was not being used as a loading place at the time of plaintiff's injury and had not been so used for at least several days prior thereto. It could not be so used, as must have been apparent to plaintiff. He saw that the adjacent street was being reconstructed and was closed to vehicular traffic. Nor was the place in question adjacent to or near the place where the busses were then stopping to take on passengers. While the exact distance of the latter place from the place of plaintiff's injury cannot be stated because the evidence does not show the length on DeBaliviere Avenue of the power house, office building and the open space between them, it is evident that the loading place then being used, which was south of the office building, on defendant's property west of the sidewalk, was considerably south and in no sense a part of the place which plaintiff, by his pleading and evidence, contends was the loading place. No bus was waiting at the place in question and in view of the condition of the street and the significant barricade, apparent to plaintiff as he admits, he could hardly have expected that one would come there. The waiting bus was south of the office building. The "Bus Stop" sign which had formerly stood near that place was not then standing there as an invitation to intending passengers to go

to that place. It cannot be said, under the facts of this case, that plaintiff presented himself at a proper place at which to board defendant's bus or that the place in question was being so used by defendant or that it impliedly invited intending passengers to go there for that purpose.

Neither do we think plaintiff's case can be maintained on this point on the theory that the place in question had been, until recently before, the customary and a proper loading place and that such place had been changed without notice to him. His petition does not appear to be framed on that theory but rather on the theory that such place was at the time of plaintiff's injury so used by defendant. But if by liberal construction we should hold, after verdict, that the petition is sufficient to include that element we cannot see that plaintiff's case can thus prosper. Defendant undoubtedly had the right to change its loading place, especially where, as here, circumstances over which it had no control required such change. If we assume, without discussing or deciding the point, that it should have notified transferring passengers ignorant of such change, that it had been made, it cannot help plaintiff because his petition does not present that issue. He does not therein allege negligence in that defendant had, temporarily or otherwise, abandoned its customary loading place and failed to notify him thereof. The only complaint in the petition regarding failure to notify or warn is that defendant failed to notify or warn him that the place in question was obstructed and of the danger of walking thereon. Since said place was not being used by defendant as a loading place and defendant was under no legal duty to see that it was safe for pedestrians and it is not shown that defendant had knowledge of the obstruction it cannot be held guilty of negligence, so far as concerns the point now under consideration, for its failure to warn plaintiff thereof.

■ III. Respondent asserts that at the time and place of his injury the relation of passenger and carrier existed between him and defendant, requiring of the latter the exercise of the highest degree of care, and that defendant, in violation of its duty to him as its passenger, failed to provide him a safe way from car to bus. The cases dealing with this subject do not seem to be in entire harmony. In some there are dicta that where a person making a trip from one point to another on the carrier's line has to transfer from one of the carrier's vehicles to another in order to complete the trip he continues to be a passenger while going from the place where he alighted from the first vehicle to the place where he is to board the second. In other cases wherein it is said the relation of carrier and passenger continues while such person is going from one place to the other there were present other circumstances such that the decisions did not have to rest upon the proposition that the relation continued in

the full sense and with all its implications. This question received careful and thorough consideration by the Virginia Court of Appeals in Virginia Railway & Power Co. v. Dressler, 132 Va. 342, 111 S. E. 243, 22 A. L. R. 301. In that case the plaintiff had taken passage on one of the defendant's street cars to go to another point in the city. In order to complete the trip it was necessary for her to transfer from the car on which she started to another of the defendant's cars. She paid one fare for the trip and at the transfer point received from the conductor of the first car a transfer ticket entitling her to proceed on another car. While crossing an intervening street as she walked from the place where she alighted from the first car to the place where she intended to board the second, she was struck by another car of the defendant, running wild—not the one from which she had alighted nor the one she intended to board. It was held that she was not then a passenger but simply a pedestrian in the street to whom the defendant owed the same duty it owed to other pedestrians crossing its tracks, but no greater. The court reviewed numerous decisions on the subject and said, 22 American Law Reports, l. c. 311:

"It will be observed that practically all of the foregoing cases belong to one or the other of two classes: Where the passenger is boarding or about to board the car, or is alighting or has just alighted from the car, and has not had the opportunity of reaching a place of safety, and in either case is injured either by the car from which he has alighted or the one he is about to board. The other class is where the passenger is within the physical control of the carrier, or the latter has undertaken, directly or indirectly, to direct the movements of the passenger. There is still a third class of cases which we have not noticed: Injuries to passengers at the stations or on the platforms of commercial steam railroads. [Such are Baltimore & O. Railroad Co. v. State, 60 Md. 449, and Parsons v. New York C. & H. Railroad Co., 113 N. Y. 355, 3 L. R. A. 683, 10 Am. St. Rep. 450, 21 N. E. 145.] Such railroads own and have complete control over not only their roadbeds, but their station platforms, yards, and sidings, and for these reasons stand on a different footing in many respects from other railways, in their relation to passengers.

"There seems to be good reason and also authority for holding that the relation of passenger is not sustained while a passenger with a transfer is outside of the direction and control of the carrier, and walking along the public highway. The reason for the high degree of care required of carriers of persons is the tender regard the law has for human life and limbs, and the fact that the carrier has the selection, control, management, and operation of the whole instrumentalities of carriage, and a limited control over and direction of the conduct of the passenger. It may make and enforce reasonable

rules for the protection of passengers, but, if the passenger may place himself outside of the pale of influence of the carrier, beyond its control and direction, and still retain his character as passenger, such rules would be wholly inoperative and useless, and the carrier would be without means to protect the passengers from injury, or itself from liability. A transfer ticket imposes no liability on the carrier to make the transfer. The passenger himself makes the transfer, and generally without direction or suggestion from the carrier. The transfer ticket is simply an undertaking on the part of the carrier to continue the carriage further, without additional charge, if the passenger, in accordance with its terms, again presents himself at the proper place for carriage. It generally designates the point at which the journey is to be renewed, but contains no contract, express or implied, for safety in making the transfer. In the interim between leaving the car and offering himself as a passenger on another, the passenger is not under the care or custody of the carrier, or subject to his direction or control, and may be far from the carrier's powers of observation. It would seem unreasonable, therefore, to hold the carrier liable to one as a passenger during such interval.'' [See to like effect Niles v. Boston El. Railroad Co., 225 Mass. 570, 114 N. E. 730.]

We have quoted at length from the Dressler case because the quoted portion in our opinion states correct reasoning and sound law and fits the facts of the instant case. While, as above stated, there appears to be some contrariety of judicial opinion as to the exact status of a person while making a transfer from one of the carrier's vehicles to another, we have been cited to no case holding that the carrier would be liable for the bad condition of a public street or sidewalk used in making the transfer, such condition not being due to the carrier's act or omission, so long as it had furnished a reasonably safe place to alight from one vehicle and board the other and the passenger was free to and did chose his own course in going from one point to the other.

Plaintiff herein was not directed or invited by defendant to take the course he took. He chose his own course. He was not then under defendant's control or supervision. It is not shown that defendant knew of the obstruction on the sidewalk and in any event it could hardly be charged with negligence for failing to anticipate that plaintiff or others transferring from cars to busses would ''jaywalk'' across the torn-up street to a point on the opposite sidewalk thirty or forty feet south of the intersection instead of going across in line with the Delmar sidewalk to the southwest corner of the intersection and thence south on the DeBaliviere sidewalk, as persons on foot would naturally be expected to do. The latter way was safe, for while the obstruction was on the DeBaliviere walk it was

near the outer edge thereof and according to plaintiff's petition that walk was wide. We cannot assume that plaintiff would have stumbled over the obstruction had he been walking south on that sidewalk.

Plaintiff in his testimony in chief said it was dark at the point where he fell. On cross-examination he qualified that testimony by saying, when asked if the corner was not well lighted, "it wasn't a well lighted corner that night for me." He could not recall whether or not there was a street light at the southeast corner of the intersection but there was one at the southwest corner which evidently shone down the DeBaliviere sidewalk. Plaintiff was somewhat nearsighted. But there was light enough that he could and did see to pick his way safely across the uneven surface of DeBaliviere and step safely up onto the curb. He saw from that point the projecting hood of the bus that was waiting south of the office building. From these facts and from his description of the street surface and surroundings at and about the intersection and the place where he fell, which he saw that night in their then condition, it is clear that there was no such lack of light as to make the way unsafe for that reason. There is no suggestion in plaintiff's petition that the way by which he had to go from the place where he alighted from the car to the place where he was to board the bus was not sufficiently lighted.

Respondent relies strongly on Watts v. Fleming, supra. In that case the defendant street car company was reconstructing its track over a viaduct and it was necessary for passengers to transfer from cars at one end of the obstruction caused by the rebuilding to cars at the opposite end on which they could complete their journeys. They were furnished transfer tickets for that purpose. It was a car to car transfer, necessitated by repair or rebuilding of defendant's track. The plaintiff's decedent had alighted from an eastbound car at the west end of the obstruction and was walking in the roadway portion of the viaduct eastward toward a street car waiting at the east end thereof when he was struck by an automobile running without headlights, receiving injuries from which he died. The accident occurred on a dark, cloudy night and there were no lights on the viaduct except "a few red lanterns in the Wyoming street approach marking the location of materials and warning that the Wyoming street approach was not yet completed." There was a sidewalk along the side of the viaduct, between which and the street car track there was a space about forty feet wide for vehicular traffic. The court said, in stating the facts, that the deceased and his companions had proceeded sixty or seventy feet eastwardly in said vehicular space when deceased was struck by the automobile; that he had to cross the vehicular space to reach the sidewalk; that: "There seems to have been no way for deceased to have reached the lines of defendant

eastwardly, except by walking across the viaduct." The court also quoted the testimony of the deceased's companion that: "We started on out to get out of there, and before we could cross the street, why he was run into. We were partly across the roadway; were, after we got off the street car, partly across, and I don't know how far we had gotten; we had not gotten very far." The court in its opinion said it was first necessary to determine the status of the deceased with reference to being a passenger at the time of the accident. It then reviewed several cases from other states and observed: "Defendants might have selected other points to stop their cars which would have been less dangerous and better lighted. The defendants knew, when they stopped their car on the incompleted piece of track that the passengers would transfer to the car upon the other side of the incompleted track or would have to walk the entire distance (to their destinations?) passing the waiting car." There are further observations indicating that the court may have thought the facts would authorize the finding of an implied invitation by defendant to transferring passengers to use the way the deceased was using. The court concluded its discussion of this branch of the case by saying: "In the view we take of the case this was a question of fact to be submitted to the jury."

It does not seem clear to us whether the court meant to hold that on the facts stated, if found by the jury, the deceased continued to be a passenger while making the journey from the place where he alighted from one car to the place where he was to board the other, or merely that under all the facts and circumstances the question of defendant's negligence was for the jury. In any event there were in the case factors bearing on the question of the defendant's liability that distinguish it from the instant case. In our opinion, under the facts of this case plaintiff cannot properly be held to have been defendant's passenger at the time and place of his injury.

Giving to plaintiff the benefit of the evidence most favorable to him, with such favorable inferences as may reasonably be drawn therefrom, as we do in ruling a demurrer to the evidence, we are yet constrained to hold that no negligence on the part of defendant was shown, and that its demurrer to the evidence should have been sustained. The judgment of the circuit court is therefore reversed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur, except *Ellison, P. J.,* absent.